BALDWIN, Circuit Judge.
 

 Shiley, Inc. (Shiley) sued Bentley Laboratories, Inc. (Bentley) for infringement of U.S. Patent Nos. 4,065,264 (’264) and 4,138,-288 (’288). Bentley counterclaimed for a declaration of invalidity, unenforceability, and non-infringement. The action was tried to a jury, and resulted in a verdict for plaintiff on all issues. The special verdict included jury findings that none of the claims in suit was invalid, that plaintiff was entitled to recover its lost profits in the amount of $17,528,000, that a reasonable royalty is twelve percent (12%) of the selling price of the accused device, that plaintiff did not commit inequitable conduct before the United States Patent and Trademark Office (PTO), and that defendant’s infringement was willful. The court denied defendant’s motion for judgment notwithstanding the verdict (JNOV), treated the jury finding of willful infringement as merely advisory, made an independent finding of willful infringement, and awarded double damages, attorney fees, prejudgment interest, and a permanent injunction. A final, amended judgment in the amount of $44,248,137 was entered against Bentley on March 13,1985.
 
 Shiley, Inc. v. Bentley Laboratories, Inc.,
 
 601 F.Supp. 964, 225 USPQ 1013 (C.D.Cal.1985).
 

 Bentley appeals from the trial court’s entry of judgment on the jury verdict and charges the district court with abuse of discretion in calculating the damage award based on the issuance date of the '264 patent, in doubling the damage award based on the finding of willful infringement, and in denying Bentley’s motion for new trial based on prejudicial error. We affirm.
 

 Background
 

 The patents in suit relate to a high efficiency heat exchanger designed for use with a blood oxygenator (the “lung” portion of the heart-lung machine employed during open heart surgery). The heat exchanger is used to lower the temperature of the blood prior to and during surgery, and then to rewarm the blood to normal temperature. The cooled blood induces a condition called hypothermia, characterized by slowed functioning of the vital organs and overall reduced oxygen consumption by the patient. Hypothermia gives the surgeon time to perform a surgical procedure and enhances the patient’s likelihood of survival.
 

 The heat exchanger of this invention can be formed from tubing which has a hollow, helical (spiral) rib along its length. The tubing is wrapped around a cylinder and then encased in a tight-fitting shell. Heated or cooled water flows through the inside of the tubing, while the blood flows along the outside.
 

 
 *1557
 

 
 *1558
 
 The combination of the rib and the surfaces of the cylinder and shell confines blood flow to a number of small, long paths. Temperature control is very efficient, due in part to the large heat exchange surface contacted by a relatively small volume of blood.
 

 The helically ribbed tubing, known by the trade name Turbotec, is made of metal. The Shiley patent specifications referred to U.S. Patent Nos. RE24,783 and 3,015,355 for methods and apparatus for manufacture of such tubing. Both aluminum and stainless steel are mentioned in the Shiley patents as possible materials for construction of the tubing. Stainless steel is compatible with a blood environment but is expensive and has poor heat conductivity. Aluminum is toxic to human blood but has good heat conductivity and is relatively inexpensive. The Shiley patents disclosed that the toxic properties of aluminum may be overcome by application of a thin coating of polyurethane.
 

 An alternative form of the tubing may have a series of individual ring-like ribs. The claims that refer to this type of tubing are 7, 8, 19 and 24 of the ’288 patent, and are referred to as the bellows claims. The district court held that these claims were not in suit because no evidence was presented that defendant was making an oxygenator according to these claims.
 

 The heat exchanger may be mounted within a blood chamber separate from the blood oxygenator, or incorporated within the oxygenator. The preferred embodiment of both Shiley patents, the Shiley product (S-100) and Bentley’s accused device (BOS-10) all have the heat exchanger located within the mixing chamber of a bubble blood oxygenator. A bubble blood oxygenator uses a device such as a sparge tube to introduce fine bubbles of oxygen and other gases into the blood. What actually travels through the heat exchanger is blood foam, not ordinary blood, and a subsequent defoaming step is required. During prosecution of the Shiley patents, the applicant demonstrated to the satisfaction of the examiner that the placement of this particular heat exchanger within the mixing tank of a bubble oxygenator results in enhanced blood-gas transfer.
 

 Issues
 

 The issues before this court are whether the district court erred in denying defendant’s motion for JNOV, and denying defendant’s motion for new trial, as well as issues relating to damages.
 

 Judgment Non Obstante Veredicto (JNOV)
 

 Inequitable Conduct
 

 Bentley argues that it is entitled to JNOV because the jury finding that Shiley made no misrepresentation or omission in dealing with the PTO is clearly erroneous, not supported by substantial evidence, and contrary to the overwhelming weight of the evidence. This argument is based on the ground of nondisclosure to the PTO of: (1) advertisements for the Turbotec tubing used in the Shiley patent, and (2) a drawing of a bubble blood oxygenator with a heat exchanger in the form of a helical coil as employed by Dr. Frank Gollan, a pioneer in the field of cardiac surgery.
 

 Bentley argues that because the Turbotec ads contained a drawing of tubing that formed a helical coil, the jury finding of no omission was erroneous as a matter of law. The jury was presented evidence from the file wrapper that the patents for the Turbotec tubing were considered by the examiner and that the PTO viewed the Turbotec patents as disclosing a heat exchanger design identical to that claimed, but that the applicant had made a sound case for patentability based on unexpectedly efficient gas interchange resulting from the specific design of the device. We conclude that a reasonable jury could have found that no omission or misrepresentation occurred with respect to the Turbotec ads, and that the district court did not err in denying JNOV on this ground.
 

 
 *1559
 
 Bentley’s argument with respect to the drawing is similarly without merit. The drawing was published by Dr. Frank Gollan in his book,
 
 Physiology of Cardiac Surgery
 
 (1959). It is a schematic drawing applicable to several oxygenators designed and tested by Dr. Gollan which employed a heat exchanger in the form of a helical coil to simultaneously oxygenate and regulate the temperature of the blood. Bentley claims this information was never presented to the PTO. Dr. Gollan is well recognized in the field of blood hypothermia. His work has been described in other publications presented to the jury by Bentley: Dr. Pierre M. Galletti’s book, Heart-Lung Bypass (1962); and DeWall, et al., “Theme and Variations on Blood Oxygenators”
 
 (Surgery,
 
 December 1961).
 

 Research on the use of hypothermia for surgical procedures has been conducted since the 1950’s. A number of different types of heat exchangers have been reported, and applicant, in both patent applications, cited “Heart-Lung Bypass” by Pierre M. Galletti, M.D. et al., pp. 165-170 (1962), for a comparison of different types of heat exchangers. The following text appears on page 167:
 

 Use has been made of this [heat transfer by conduction] with different geometrical configurations: coils, cylinders or plates. Each of these three types feature advantages and drawbacks.
 

 1. A simple silver
 
 coil immersed in the pump oxygenator
 
 has served successfully for cooling and warming of the entire circulation of dogs by
 
 Gollan,
 
 et al. (1952)
 
 (see fig. 21.
 
 A). Peirce and Polley (1953, 1956), Dietman (1955) and Oselladore, et al. 1957 found the same type of heat exchanger reliable. For au-togenous lung oxygenation, Shields and Lewis (1959) inserted a
 
 stainless steel coil
 
 in both right heart bypass and left heart bypass circuits. A
 
 double lumen coil,
 
 with the blood circulating inside and the water outside, was proposed by Ross (1954 a). Zuhdi, et al. (1960 b. 1961) astutely thought of a long
 
 stainless steel spiral
 
 wound in the helix settling chamber of the DeWall-Lilleher bubble oxy-genator (fig. 59 C). * * *. [Emphasis added.]
 

 The citation to figure “21. A” refers to page 70 of that same text, and to a drawing of the Gollan oxygenator. Applicant did not cite directly to page 70 of “Heart-Lung Bypass,” an omission that is the substantive basis for Bentley’s contention that Shiley engaged in inequitable conduct before the PTO.
 

 The jury was presented considerable evidence on the issue of whether an omission had been made. It heard evidence that the Gollan oxygenators were used in pioneer work on open heart surgery in animals. It heard further evidence that the PTO had reviewed more current prior art, including Patent No. 3,437,450 to Greenwood, which Bentley admitted on appeal does disclose simultaneous temperature control and oxygenation of the blood. The jury watched a film of a Gollan oxygenator in operation, showing how it operates differently from the invention claimed in the patent in suit, and that it has areas of stagnation, a potentially deadly flaw.
 

 The jury was presented voluminous evidence during trial before reaching its conclusion that no omission had been made. Substantial evidence supports the jury findings. Bentley’s argument, which selectively presents what favorable evidence may exist, does not warrant reversal of that fact finding.
 

 Willfulness
 

 Bentley argues that the district court should have granted Bentley’s JNOV motion on willful infringement because the undisputed facts establish that Bentley did not willfully infringe as a matter of law. In this case, the jury found willful infringement and the judge independently found willful infringement.
 
 See Shiley, Inc. v. Bentley Laboratories, Inc.,
 
 601 F.Supp. 964, 968, 225 USPQ 1013, 1016 (C.D.Cal.1985). The findings are in agreement and
 
 *1560
 
 are amply supported by the record. The trial court exercised its discretion to award double damages based on its finding of willful infringement. We find no abuse of discretion in this award,
 
 see Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.,
 
 761 F.2d 649, 656-57, 225 USPQ 985, 989-90 (Fed.Cir.),
 
 cert. denied,
 
 — U.S. —, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985), or in the award of attorney fees on this basis
 
 see Rosemount, Inc. v. Beckman Instruments, Inc.,
 
 727 F.2d 1540, 1547-48, 221 USPQ 1, 8-9 (Fed.Cir.1984).
 

 The trial court apparently deemed it necessary to label as “advisory” one of the jury’s fact findings on willful infringement, and to make its own finding of fact, to enable it to exercise the court’s statutory discretion to award increased damages. 35 U.S.C. § 284.
 
 *
 
 That step was neither appropriate nor necessary. All fact findings of a jury are non-advisory, unless made in an area expressly removed from jury verdict. The first sentence of § 284 deals with actual damages, which, if not found by the jury, must be found by the court. The second sentence deals with increasing damages, which is assigned to the court, whether the facts of willful infringement justifying an increase are found by a jury, or by a court in a non-jury trial. Thus, if a jury finding of willful infringement is not overturned on a motion for JNOV, the court has discretion to award increased damages on the basis of the jury’s finding; if the jury finding is that willful infringement did not occur and that finding is not overturned on a motion for JNOV, no basis for assessing increased damages for willful infringement exists; if the jury finding is that willful infringement did not occur, and the court does overturn that finding on a motion for JNOV because no reasonable jury could on all the facts find an absence of willful infringement, the court may increase damages within its discretion under § 284.
 

 Bentley argues that since it began to market its infringing device a month before any of Shiley’s patents issued, its infringement cannot be willful as a matter of law under
 
 State Industries, Inc. v. A.O. Smith Corp.,
 
 751 F.2d 1226, 224 USPQ 418 (Fed.Cir.1985). We disagree.
 
 State
 
 does not, as Bentley contends, hold that a finding of willful infringement can not stand whenever manufacture of an accused device begins prior to the issuance of a patent. On the contrary,
 
 State
 
 is in harmony with our prior and subsequent case law, which looks to the “totality of the circumstances presented in the case,”
 
 Central Soya Co. v. George A. Hormel & Co.,
 
 723 F.2d 1573, 220 USPQ 490 (Fed.Cir.1983).
 

 Obviousness/Manner of Making Invention
 

 Bentley argues that the district court should have granted Bentley’s JNOV motion because the inventions of the Shiley patents would have been obvious as a matter of law. It argues that John Lewin, the inventor, was a mechanical engineer who had no work experience with blood or blood oxygenators, and that he necessarily had less than ordinary skill in the art; that he saw a Turbotec tubing ad and immediately conceived the successful design to obtain a known result. Extensive evidence on these and related factual issues pertinent to obviousness was presented to the jury, who were correctly instructed that patentability of an invention does not depend on how the invention was made. 35 U.S.C. § 103. We see no reversible error in the district court’s refusal to grant JNOV on the basis of Bentley’s argument.
 

 Motion for New Trial
 

 Denial of Declaratory Judgment Counterclaim
 

 Bentley argues on appeal that its motion for new trial should have been granted
 
 *1561
 
 because the district court refused to try its declaratory judgment counterclaim with respect to claims 6, 7, 19, and 24 (bellows claims) of the ’288 patent. Bentley asserts (1) it presented evidence to the trial court that a bellows oxygenator was being made by Bentley at that time; (2) it was prepared to prove that Shiley had engaged in inequitable conduct in its dealings with the PTO by concealing an on-sale bar with respect to these claims; and (3) the district court refused to admit evidence with respect to the allegedly inequitable conduct. These assertions are not supported by the record.
 

 One month prior to trial, Bentley’s counsel sought declaratory judgment of non-infringement with respect to the bellows claims. Shiley objected because Bentley had successfully prevented discovery with respect to its experimental bellows oxygenators by raising the attorney/client privilege. The trial court attempted to determine what effect denial of the counterclaim would have on Bentley’s rights. In response to the trial court’s statement that it did not know how the doctrine of res judicata applied in patent cases (i.e., whether a defendant could later proceed against unadjudicated claims of a patent) and an invitation to counsel to comment, counsel for Bentley stated:
 

 MR. LYON: There is one problem that worries me, your Honor.
 

 That is, if after this trial, we decided to make a bellows-type device, will we be . precluded from asserting invalidity of those claims in view of the proceedings today?
 

 If your ruling is such that that might be preserved to us, then we have no objection to your Honor so ruling.
 

 Contrary to Bentley’s appellate brief, Bentley presented no evidence to the trial court that the bellows oxygenator was being made. Instead, Bentley stated only that they might be made in the future, and did not object to the court’s ruling.
 

 Bentley’s second assertion that it was prepared to prove that Shiley engaged in inequitable conduct in its dealings with the PTO by concealing an on-sale bar with respect to the bellows claims, is not supported by evidence. The evidence consists of two documents written by Bentley’s counsel, and a proposed issue of fact for the jury. One document is defendant’s exhibit 298, a copy of a memorandum to file containing a statement that “discovery has established that the S-100 was on sale, in public use and illustrated in printed publications more than a year prior to that date,” without elaboration. The other document is defendant’s exhibit 297, a letter which contains no mention of the on-sale bar. The proposed jury question, of course, is not evidence.
 

 Even if these documents could have raised the issue of an on-sale bar, Bentley is unable to argue prejudice from the district court’s refusal to admit them, because these exhibits were offered and accepted into evidence.
 

 Bentley also argues that the district court’s denial of the declaratory judgment counterclaim allowed Shiley to narrow the scope of the adjudicated claims during trial, thereby precluding Bentley from asserting certain prior art against the claims in issue. Bentley’s argument with respect to its allegedly invalidating prior art falls because the prior art was offered and accepted into evidence at trial.
 

 Jury Interrogatories/Inequitable Conduct
 

 Bentley argues that Shiley engaged in inequitable conduct by concealing material prior art from the PTO during prosecution of its patents, and that it is entitled to a new trial because the jury made no findings of materiality and intent. The issue was submitted to the jury as follows:
 

 9. Please answer each of the following questions on the issue of “inequitable conduct.”
 

 (a) Do you find that the patent applicant or his attorney or agent made any misrepresentation or omission in their dealings with the Patent Office?
 

 Answer separately as to each claim:
 

 
 *1562
 
 The ’264 Patent—
 

 Claim 3 NO (Yes or No)
 

 Claim 4 NO (Yes or No)
 

 Claim 6 NO (Yes or No)
 

 Claim 8 NO (Yes or No)
 

 Claim 11 NO (Yes or No)
 

 Claim 12 NO (Yes or No)
 

 Claim 17 NO (Yes or No)
 

 Claim 18 NO (Yes or No)
 

 The ’288 Patent—
 

 Claim 1 NO (Yes or No)
 

 Claim 2 NO (Yes or No)
 

 Claim 3 NO (Yes or No)
 

 Answer the following questions only if your answer to Question 9(a) was “yes” with respect to at least one claim.
 

 (b) As to any misrepresentation or omission that you find was made, was it
 
 material,
 
 in that:
 

 (i) there is a substantial likelihood that a reasonable patent examiner would consider the information important?
 

 _ (Yes or No)
 

 (ii) the patent would not have issued,
 
 but for
 
 the misrepresentation or omission?
 

 _ (Yes or No)
 

 (iii) the misrepresentation or omission
 
 may have
 
 reasonably affected the examiner’s decision to issue the patent?
 

 _ (Yes or No)
 

 (c) What do you find to be the state of mind with which the misrepresentation or omission was made?
 

 (i) That it was done intentionally to deceive or mislead the Patent Office?
 

 _ (Yes or No)
 

 (ii) That it was done with recklessness or gross negligence?
 

 _ (Yes or No)
 

 (iii) That it was done with a less culpable state of mind than either of the two states of mind specified above or with a state of mind of no culpability at all?
 

 _ (Yes or No)
 

 Objection to the form of all the questions presented to the jury was made by both parties.
 

 The special verdict form presented to the jury was accompanied by clear and complete instructions. This approach is not error.
 
 See Weinar v. Rollform, Inc.,
 
 744 F.2d 797, 223 USPQ 369 (Fed.Cir.1984),
 
 cert. denied,
 
 — U.S. —, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985). Had the jury found that a misrepresentation or omission had been made, then questions of materiality and intent would arise. Since the jury answered no to interrogatory 9(a), supra, and this finding was supported by substantial evidence, no further inquiry was necessary.
 

 Inflammatory Statement
 

 Bentley argues that its motion for new trial should have been granted because the district court committed prejudicial error by allowing Shiley’s counsel to cross examine Mr. Bentley and elicit an admission that his company had been adjudged a willful infringer in prior litigation with a third party. As Shiley points out, Bentley neglects to mention that it laid the groundwork for Shiley’s questions during its own direct examination. Mr. Bentley testified on direct examination that Bentley had not copied the Shiley S-100, that he had not seen the S-100 prior to the production of the BOS-10, that he was President, Chief Executive Officer, and Chairman of the Board of Bentley, and that he was intimately involved in the development of Bentley devices. He also testified as to his integrity and personal involvement in avoiding “conflict” with other patents.
 

 Bentley had made a pre-trial admission that it had possession of four models of the S-100 prior to the development of the BOS-10. Mr. Bentley’s credibility was squarely placed in issue by his direct testimony. He stated on cross-examination that he personally maintained a policy of avoiding infringement of other firms’ patents. The district court, over timely objection, permitted Shiley to impeach the witness using a detailed recitation of Mr. Bentley’s activities as recorded in the opinion in
 
 Deknatel, Inc. v. Bentley Sales, Inc.,
 
 173 USPQ 129 (C.D.Calif.1971). We find no error in the judge’s ruling under these circumstances. Fed.R.Evid. 608 and 611.
 

 Jury Instruction/Damages
 

 Bentley argues it is entitled to a new trial because the district court’s in
 
 *1563
 
 struction on damages, over objection, asked the jury to assess damages from December 27, 1977, the issue date of the ’264 product patent. Bentley claims that Shiley did not prove marking of the S-100 with notice of the ’264 patent, and pursuant to 35 U.S.C. § 287, Shiley may only rely upon February 6, 1979, the issue date of the ‘288 method patent, as the commencement date for any damages. An examination of the record reveals that the objection Bentley made was to “all parts of the verdict
 
 form”
 
 [emphasis ours]. This objection does not conform to the requirements of Fed.R. Civ.P. 51 and is insufficient to preserve this type of error on appeal. Further, it appears from the record that marking of the S-100 was not in issue at trial.
 

 We have considered Bentley’s arguments with regard to prejudgment interest and find them without merit.
 

 We have carefully considered Bentley’s other arguments and citations to precedent and the record. We find them devoid of merit. The judgment appealed from is
 
 affirmed.
 

 AFFIRMED.
 

 *
 

 35 U.S.C. § 284 provides in part:
 

 When the damages are not found by a jury, the court shall assess them. In either event the court may increase the damages up to three times the amount found or assessed.